JENKINS–KREER & CO., Inc., v. COMMISSIONER OF INTERNAL REVENUE.

No. 4378.

Circuit Court of Appeals, Seventh Circuit.

April 18, 1931.

Rehearing Denied July 8, 1931.

Clarence N. Goodwin, of Chicago, Ill., for petitioner.

G. A. Youngquist, Asst. Atty. Gen., and F. Edward Mitchell and Sewall Key, Sp. Assts. to Atty. Gen., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Robert L. Williams, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for respondent.

Before ALSCHULER, EVANS, and SPARKS, Circuit Judges.

SPARKS, Circuit Judge.

This appeal involves petitioner's income and profits taxes for the fiscal year ended November 30, 1920.

Petitioner is an Illinois corporation. Its business is selling goods for mills on commission, and also purchasing goods which it converts into other and different sorts of cloth by printing, dyeing, or bleaching, and which it resells as its own product to its own customers. During the fiscal year ended November 30, 1920, the stockholders of petitioner numbered nine, one of whom was S. C. Downs. He owned ten shares of the common stock, had a desk in the office of the corporation, attended regularly at the office, and devoted approximately one-fourth of his time to petitioner's business. All the other stockholders devoted their entire time to the business. Of these Jenkins was president, and he was engaged in the general supervision of the business and the usual duties of an active president of a company. He did some of the purchasing and general managing. Field was vice president, in charge of the sales of the organization, and he assisted in the general conduct of the business. Toates was secretary and treasurer, and he kept the records, looked after the credits, and had charge of the office. The other directors were salesmen. The employees, other than the stockholders and one traveling salesman, consisted of office clerks, bookkeepers, stenographers, a switchboard operator, and a shipping clerk. The shipping clerk's duties related to trade sales, and the services of the other employees were devoted approximately 95 per cent. to trade sales and 5 per cent. to commission sales. On commission sales the salesmen solicited orders and sent them to petitioner, who transmitted them direct to the mills; and when the orders were accepted the mills paid petitioner the amount of commission without waiting for payment for the goods.

During the fiscal year in controversy petitioner made commission sales in the amount of $6,010,488.50. The total salaries, excepting the compensation of officers, was $41,-438.96. Traveling expenses were $7,292.01, which constituted the entire sales expenses. Rent was $1,500, insurance $376.57, expenses of petitioner's New York office $3,030.19, and the commissions on the trading portion of the business $633.11. The compensation of officers was $29,700, of which $8,838.52 was segregated by petitioner as sales expenses and the balance was allocated to general expenses. Interest in the sum of $858.28, in connection with the trading business, was paid, as well as taxes in the sum of $1,350.62, and depreciation on furniture and fixtures in the sum of $250 was sustained. According to petitioner's books its sales expenses during the year amounted to $48,989.01, and sundry expenses of $6,584.86 were listed as part of its general expenses.

Petitioner's trade sales cost approximately three times as much as its commission sales on the same volume of sales, and its sales expenses were allocated by it as $6,549.83 for its trade accounts, and $42,439.18 for its commission accounts. At least 75 per cent. of its general expenses were attributable to the trading business, and 25 per cent. to the commission business. Petitioner's trade sales were approximately $1,400,000, and its gross profit thereon was $25,226.20; its commission sales exceeded $6,000,000, and its commission thereon aggregated $146,689.86.

During the year in controversy petitioner purchased goods amounting to $1,258,951.23 for sale or conversion, paid freight and cartage of $2,389.28, and had an inventory, as of December 1, 1919, of $217,982.77, and on November 30, 1920, of $108,578.67. On November 30, 1919, it had on hand an item of cash of $7,378.59 and on November 30, 1920, $35,835.99. At the end of the year 1919 it had trade accounts and notes receivable of $234,214.52, and a year later of $206,949, resulting from goods sold as a principal. It had investments in war-savings stamps and Liberty Loan bonds of $7,923 in 1919, and the same amount a year later. It also carried on its books an item called "brands, labels, and good will" in the amount of $20,000, being its estimate of the value of certain nationally known trade brands which it handled

as a principal. On November 30, 1919, it had notes payable of $30,000, money borrowed for merchandising goods traded in as a principal, and it had accounts payable on the same date of $90,027.80, representing goods bought for resale. A year later the same items aggregated $16,546.37 and $15,723.05.

The total capital stock of petitioner outstanding on November 30, 1920, was $165,000. On November 30, 1919, its surplus and undivided profits were $57,091.66, and a year later were $100,951.15.

In handling its commission sales petitioner never advanced any money to its customers.

Respondent denied petitioner's claim for personal service classification under section 231 of the Revenue Act of 1918 (chapter 18, 40 Stat. 1057, 1076, 1077), and determined the deficiency. Upon the hearing of the petition for redetermination of the deficiency before the Board of Tax Appeals the commissioner was sustained. The record contains a stipulation and agreement of the parties that at the hearing of this case evidence was introduced on behalf of the parties tending to sustain all the findings of the board contained in the opinion and findings of fact.

It is not claimed by petitioner that the facts as found by the board are without proper legal foundation, but it contends that the board reached a wrong conclusion from the facts so found.

■■■ The only question urged by petitioner is its right to personal service classification, under section 231 (14) of the Revenue Act of 1918, as a basis for computing its tax liability. This was denied by respondent on the ground that capital was a material income-producing factor in petitioner's business. Such determination is prima facie correct, and it is incumbent upon petitioner to overcome the presumptive correctness of that ruling. United States v. Rindskopf, 105 U. S. 418, 26 L. Ed. 1131; Wickwire v. Reinecke, 275 U. S. 101, 48 S. Ct. 43, 72 L. Ed. 184.

Section 231 (14) referred to above reads as follows:

"Sec. 231. That the following organizations shall be exempt from taxation under this title— * * * (14) Personal service corporations."

Section 200 of the same act (40 Stat. 1059) defines a personal service corporation to mean "a corporation whose income is to be ascribed primarily to the activities of the principal owners or stockholders who are themselves regularly engaged in the active conduct of the affairs of the corporation and in which capital (whether invested or borrowed) is not a material income-producing factor; but does not include any foreign corporation, nor any corporation 50 per centum or more of whose gross income consists either (1) of gains, profits or income derived from trading as a principal. * * * "

The controversy before us arises over the interpretation of the word "income" as used in the statute. The board construed it to mean gross income, while petitioner insists that it means net income, or profit. According to petitioner's construction, section 200, above referred to, would read: The term personal service corporation means a corporation whose net income or profit is to be ascribed primarily to the activities of the principal owners or stockholders * * * and in which capital * * * is not a material net income or profit producing factor; but does not include * * * any corporation 50 per centum or more of whose gross income consists either (1) of gains, profits or income derived from trading as a principal, or (2) of gains, profits, commissions, or other income derived from a government contract.

■■■ In this view we cannot concur, and we think the board correctly held that wherever the word "income" is used in section 200 it means gross income. We interpret this section to mean that where 50 per centum or more of the gross income consists of gains, profits, or gross income derived from trading as a principal, etc., it is to be conclusively presumed that the corporation is one whose capital is a material income-producing factor. On the other hand, if a less amount than 50 per centum of the gross income consists of the items named, the presumption does not arise; but, in such case, whether capital is a material gross income-producing factor depends upon the facts involved. The limitation of 50 per centum is not the basis for determining whether capital is a material income-producing factor, but rather it is a point of limitation at and beyond which the proof of the ultimate fact becomes conclusive. Below this point it still remains a matter of proof.

■■■ We are of the opinion that the facts as found by the court amply support the board's conclusion that petitioner was not entitled to classification as a personal service corporation.

Petitioner claims, however, that there is no finding by the board that petitioner corporation, in the year in controversy, was one in which capital was a material income-producing factor. This is quite true, but an affirmative finding of such fact was not necessary in order to support a ruling in appellee's behalf, although the evidence submitted in our opinion is ample to support such a finding.

The statute above referred to, under which petitioner is seeking relief, is an exempting statute, and unless petitioner brings itself within the terms of that statute it cannot recover. The burden of proof was upon petitioner to establish the existence of two conditions during the time in controversy, (1) that the income of the corporation resulted primarily from the activities of the principal owners or stockholders who were themselves regularly engaged in the active conduct of the affairs of the corporation, and (2) that the capital of petitioner, whether invested or borrowed, was not a material income-producing factor. Prey Bros. Live Stock Commission Co. v. Commissioner (C. C. A.) 36 F.(2d) 326. It was not denied that condition 1 existed. Both parties hereto, in argument and briefs, have assumed its existence, and the record shows that the board gave as the reason for its ruling on this particular branch of the case the nonexistence of condition 2. A failure to find the existence of a fact, the truth of which is necessary for petitioner to establish, is equivalent to a finding against the petitioner as to such matter. In order to find for respondent it was not necessary for the board affirmatively to find that the capital of petitioner was a material income-producing factor, otherwise the burden of proving such fact must be considered as being upon respondent, and this is not the law.

We think the board's ruling was fully justified under Denver Live Stock Commission Co. v. Commissioner (C. C. A.) 29 F.(2d) 543, 544, in which the court used the following language:

"Thus its income from capital sources was approximately one-fifth of its total income. It is true that deductions on account of rediscounts, etc., reduced its net income from capital sources * * * to a loss; but this does not alter the principle that the capital invested was income producing and formed one factor of its business. In such case, the loss or gain must be computed upon the entire business and not upon any one factor. * * * *"

Petitioner attempts to distinguish the Denver Case from the instant case by virtue of the fact that in the Denver Case the petitioner made loans to its customers to finance their purchases, while in the instant case the petitioner in handling its commission sales did not do so. We are unable to recognize this as a material distinguishing difference; for in the instant case, aside from the commissions, the board held, in effect, that the use of petitioner's capital was a material income-producing factor as compared to the total income from all sources. In this we think the board ruled correctly, and the order is affirmed.